UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| PAUL VANDEWALLE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No.: 3:07-CV-400 PS |
| ) | |
| CPL PAUL MOFFA, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Paul Vandewalle and his wife, Suzette, live in South Bend, Indiana. So while they get to enjoy many of the benefits of living near the University of Notre Dame, the fall often brings the headaches of traffic restrictions aimed at facilitating the legions of fans attending Notre Dame's home football games. After the Notre Dame-University of Southern California tilt on October 15, 2005, the Vandewalles encountered some of those restrictions. They were on their way to the bank when they realized that the left turn they needed to take was prohibited and the center lane was blocked by a barricade and police officers, including Defendant Corporal Paul Moffa. But they pulled into the barricaded center lane anyway. Paul asked Moffa if he would bend the rules, but Moffa said no and told the Vandewalles to return to the right lane. The discussion continued, but Moffa wouldn't budge. Suzette (who was driving) eventually decided to swing the car into the left lane despite being told by Moffa to return to the right lane. She says she did this because she could not get over to the right lane without doing so. Moffa lunged at the car trying to prevent Suzette's maneuver and smashed Suzette's windshield with his flashlight in the process. Suzette accelerated away from Moffa, knocking him to the ground.

She stopped a short while later. Paul and Suzette were quickly and forcefully handcuffed and arrested. Paul brought this suit against Moffa and the County Sheriff who employs him alleging violations of 42 U.S.C. § 1983 and various state law torts. The defendants have moved for summary judgment on all of Paul's claims which, for the reasons outlined below, I grant in part.

**BACKGROUND**

As will come as no surprise to anyone who lives near a major university's football stadium, the authorities restricted traffic on certain streets surrounding Notre Dame's stadium the day of the Notre Dame-USC game. (DE 40 at 2.)[1] With Matt Leinart leading the Trojans at quarterback and Reggie Bush running like a man possessed, USC snuck by the Irish. But a few hours after the game, traffic was still restricted as the Vandewalles approached the intersection of Juniper and Douglas streets. (DE 40 at 2.)[2] They were traveling north on Juniper, which ordinarily has one northbound lane, one southbound lane, and a center, left-turn-only, lane for northbound traffic. (*Id*. at 2-3.) But on that day the center lane (i.e the left-turn-lane) was barricaded just south of the intersection with Douglas, and Moffa manned the barricade. (*Id*.) The Vandewalles were in the center lane when they approached Moffa and the barricade. (*Id*. at 3.) They needed to take a left onto Douglas in order to get to the bank so they could make a

---

[1] The parties essentially agree about the facts of the case. (*See* DE 51 at 1.) While Paul only states that he agrees with the Defendants recitation of the facts on pages 2 and 3 of their brief, he does not really dispute the remainder of the Defendants' recitation. I will note where the two sides differ and of course apply the appropriate presumptions depending upon the legal issue.

[2] There is no evidence about who actually owns the car Suzette was driving. Because non-movants are entitled to all reasonable inferences on summary judgment, *see Haefling v. United Parcel Serv., Inc.*, 169 F.3d 494, 497 (7th Cir. 1999), I presume that Paul owns the car. Regardless, the point was not raised by the parties. Nor did the Defendants make an argument about Paul's standing.

deposit before they left town the next morning. (*Id*. at 2.) The Vandewalles stopped short of the barricade and Paul asked Moffa if they could turn left onto Douglas so they could get to the bank. (*Id*. at 3.) Moffa said no. (*Id*.) The back and forth continued between Paul and Moffa, and eventually the Vandewalles decided to move on and return to the right lane as Moffa had instructed them. (*Id*. at 3-4.)

If only it were that simple. Suzette looked in her rear-view mirror and saw that a car prevented her from backing up. (*Id*. at 4.) She decided to swing left of the barricade and, so she says, then swing back to the right and return to the proper lane. (*Id*.) She did not inform Moffa of her plan. (*Id*.) As she began to make her move, Moffa saw the car veer to the left. (*Id*.) Evidently presuming that Suzette was disobeying his lawful command, Moffa lunged at the car and broke the windshield with his flashlight in the process. (*Id*.) Suzette then slammed on the gas and accelerated several car lengths toward the intersection, causing Moffa to roll off the side of the car. (*Id*.) Paul told Suzette to stop the car and two other officers jumped in front of it. (*Id*. at 5.)

When Suzette stopped, Moffa ran toward the car and Paul got out and yelled "Why did you smash our windshield?" (*Id*.) Paul was immediately handcuffed (it is not clear whether Moffa or another officer handcuffed Paul, (*see* DE 57 at 5 n.3)), and Moffa then approached Suzette, who was still in the car. (DE 40 at 5.) Paul was seated on the curb and then placed in the back seat of a police car. (*Id*.) However, because Paul complained that the car was claustrophobic, he was later allowed to stand next to the car. (*Id*.) He was eventually taken to the Notre Dame Security Office and then the St. Joseph County Jail, but he has no complaints

about his treatment during that time. (*Id*.) He was released the next morning and able to catch a flight out of town. (*Id*.)

Paul filed his complaint against Moffa, St. Joseph County and its Sheriff's Department, and the Indiana State Police in August 2007. (DE 1.) I have already dismissed the claims against the Indiana State Police. (DE 60.) Presently before the Court are cross motions for summary judgment by Paul, (DE 50), and the three remaining defendants, (DE 39).

## DISCUSSION

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). No genuine issue for trial exists "[w]here the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Commc'ns, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992) (internal quotations omitted). A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). In making this determination, the Court must draw every reasonable inference from the record in the light most favorable to the non-moving party. *Haefling*, 169 F.3d at 497. But the nonmoving party is not entitled to the benefit of "inferences that are

4

supported by only speculation or conjecture." *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008) (quotation marks and brackets omitted).

Paul's complaint asserts six claims against Defendants. (*See* DE 1.) The first is a claim under 42 U.S.C. § 1983, alleging that Moffa's actions violated Paul's federal rights. (*See id*. ¶¶35-39.) The remaining counts assert various state law torts including false arrest and battery, which in this case is essentially an excessive force claim. (*Id*. ¶¶40-61.)

Defendants' motion argues they are entitled to summary judgment on all of Paul's claims. (*See* DE 40.) They first contend that there was no violation of § 1983, but even if there was they are entitled to qualified immunity. (*See id*. at 7-17.) They then contend that the County and its Sheriff's Department are improper defendants. (*See id*. at 17-18.) Finally, they argue that they are entitled to summary judgment on the state law claims because the claims either fail on the merits or are defeated by the Indiana Tort Claims Act. (*See id*. at 18-21.) I will first deal with the Defendants' argument that the County and Sheriff's Department cannot be held liable in this case, and then turn to Paul's § 1983 and state law claims.

I.  **ST. JOSEPH COUNTY AND ITS SHERIFF'S DEPARTMENT**

As a preliminary matter, both the County and its Sheriff's Department argue that they are improper defendants. They contend they cannot be held liable for Paul's § 1983 claim under the Supreme Court's decision in *Monell v. Dep't of Social Services of City of N.Y.*, 436 U.S. 658 (1978), and that, regardless, the Sheriff's Department has not been properly named. The County is correct with respect to the first because it has no policymaking authority over the Sheriff's Department as a matter of law. The Sheriff's Department is also correct in its *Monell* argument because there is no evidence of a policy or custom in this particular case.

5

*Monell* holds that a municipality cannot be liable under § 1983 on a *respondeat superior* theory. 436 U.S. at 691. Instead, a § 1983 action against a municipality must allege that the execution of the municipality's policy or custom inflicted the injury or that the actions were undertaken by a policymaker. *Id*. at 694.

As for the County, it cannot be held liable under *Monell* because under Indiana law, it has no authority to make policy or custom for the Sheriff's Department. The first question in a § 1983 case against a governmental entity is whether that entity has final policymaking authority. *See Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 619-20 (7th Cir. 2001). That is a question of state law. *Id*.³ Under the Indiana Constitution, sheriff's departments are independent of their counties. *See* IND. CONST. art. 6, § 2. Although officers employed by the sheriff's department are employed by the county, they operate under the control of the county sheriff. *Hebert v. Porter County, Ind.*, No. 2:07-CV-91, 2007 WL 2363835, at *3 (N.D. Ind. Aug. 14, 2007) (citing Ind. Code § 36-8-10-4(a)). *See also Pitts v. Elkhart County*, No. 3:05-CV-38, 2007 WL 3256663, at *5 (N.D. Ind. Nov. 2, 2007). Because the County does not have policymaking authority, Paul cannot demonstrate the policy or custom necessary to hold St. Joseph's County liable under *Monell*.

---

³ Paul cites *Jones v. Bowman*, 694 F. Supp. 538 (N.D. Ind. 1988), and *Slay v. Marion County Sheriff's Dep't*, 603 N.E.2d 877 (Ind. Ct. App. 1992) for the proposition that the County can be held liable here. (*See* DE 40 at 18.) The analysis of those cases was subsequently rejected by the United States Supreme Court in *McMillian v. Monroe County, Ala.*, 520 U.S. 781, 786 (1997), which held that *state* law determines whether an entity has policymaking authority for *Monell* purposes under § 1983.

Similarly, Paul's § 1983 claim against the Sheriff's Department fails because the facts do not support such a claim.[4] Beat officers like Moffa are clearly not policymakers, *Eversole v. Steele*, 59 F.3d 710, 716 (7th Cir. 1995), and Paul does not contend otherwise. Moreover, Paul has not asserted that the Sheriff's Department failed to train Moffa properly. Rather, Paul contends that the County (and presumably its Sheriff's Department, although his brief does not say so explicitly) should be liable because it allowed Moffa to be placed on traffic control duty even though he had previously been removed from that position because of a similar incident. (*See* Speybroeck Aff. ¶7 [DE 52-2 at 2].) But the evidence does not show that the Sheriff's Department actually condoned Moffa's actions. To the contrary, Moffa was disciplined for his earlier conduct. (*See id*.) Further, the record is devoid of evidence that the Sheriff's Department's actions - even in returning Moffa to the traffic detail - rose to the level of a policy or custom of allowing officers to break citizens' windshields for traffic violations. In sum, there is no genuine issue of material fact regarding Paul's *Monell* claims. They fail.

## II. PAUL'S § 1983 CLAIMS

I now turn to Paul's § 1983 claims against Moffa individually. Section 1983 provides a remedy for certain violations of federal rights. But I need not delve into the substantive analysis of Paul's § 1983 claims because Moffa is protected by the doctrine of qualified immunity in this case. Qualified immunity protects government officials from civil liability when, in the performance of their discretionary functions, their conduct does not violate "clearly established

---

[4] The Sheriff's Department contends that Paul should have named the actual sheriff "in his official capacity," (*see* DE 57 at 10-11), but this is a distraction. Official capacity suits are just one way to assert a claim against a sheriff's department, but they are not the exclusive way. *See Ky. v. Graham*, 473 U.S. 159, 165-66 (1985).

statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). *See also Viilo v. Eyre*, 547 F.3d 707, 709-10 (7th Cir. 2008). It is meant "to protect all but the plainly incompetent or those who knowingly violate the law . . . and is meant to allow for reasonable errors because officials should not err always on the side of caution because they fear being sued." *Humphrey v. Staszak*, 148 F.3d 719, 727 (7th Cir. 1998) (quotation marks and citation omitted).

In qualified immunity cases, courts examine both whether, taken in the light most favorable to the plaintiff, the facts show the officer's conduct violated a constitutional right and whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). This is an objective analysis. *See Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 472 (7th Cir. 1997). And until the Supreme Court's recent decision in *Pearson v. Callahan*, 129 S. Ct. 808 (2009), courts were required to take the *Saucier* steps in order. But the Court in *Pearson* - responding to a rash of criticism of the *Saucier* mandate - changed course and held that the order of the analysis "should not be regarded as mandatory in all cases," and left it to the district court's discretion to choose the order in any given case. *Id*. at 818.

There are two potential bases for Paul's § 1983 claim. The first is that Moffa used excessive force when he broke the Vandewalles' windshield. The second is that he used excessive force against Paul after Paul exited the vehicle. I will deal with the latter claim first. With respect to Moffa's actions once Paul got out of the car, my analysis begins and ends with the first prong of the *Saucier* protocol.

8

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures. . . ." U.S. CONST. amend. IV. "[A]ll claims that law enforcement officers have used excessive force . . . in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard. . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989) (emphasis omitted). "This inquiry involves a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005) (quotation marks omitted). The excessive force analysis is "not capable of precise definition or mechanical application" but "requires careful attention to the facts and circumstances of each case, including the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether he [was] actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (quotation marks and citations omitted). The court must balance the amount of force used in relation to the danger posed to the community or to the arresting officers. *Smith v. City of Chi.*, 242 F.3d 737, 743 (7th Cir. 2001). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

Moffa did not violate Paul's constitutional rights once Paul got out of the car. For one thing, even though Paul was handled forcefully, he was not beaten - he was just handled forcefully until he was in handcuffs. Once he was restrained, he was handled with care. Indeed, he was even removed from the squad car because he was claustrophobic. More importantly,

9

once Suzette accelerated away from Moffa, the officers encountered a potentially dangerous situation. From their perspective, the Vandewalles' car had just hit Moffa and knocked him to the ground, drove away from the scene, and was stopped by other officers, and Paul appeared to be renewing the confrontation with Moffa by getting out of the car yelling at him. At a minimum, those facts demonstrate probable cause that Paul was "interfer[ing] with a law enforcement officer . . . lawfully engaged in the execution of [his] duties" under Ind. Code § 35-44-3-3(a)(1). While the severity of the crime might not have been great, it appeared that the Vandewalles had already injured one officer and could endanger others. Based on those factors, and the relatively little force applied to Paul, no reasonable person could find that Moffa violated Paul's constitutional rights. Thus, Moffa is entitled to qualified immunity with respect to Paul's claims once he exited the car.[5]

Whether Moffa violated Paul's constitutional rights when he broke the windshield is a closer call. Fortunately, I need not be detained by that analysis because even if Moffa did violate Paul's rights, those rights were not clearly established at the time of the incident. So I will use my *Pearson* discretion to jump to the second prong of the *Saucier* analysis.

Evaluating whether a right is clearly established "turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at

---

[5] Paul points to subsequent charging decisions to support his claim of excessive force. But what the prosecutor chose to do after the fact is neither here nor there. "Probable cause for arrest is demonstrated by facts and circumstances known to the arresting officer that would warrant a person of reasonable caution and prudence to believe that the accused had committed or was committing a criminal offense." *Earles v. Perkins*, 788 N.E.2d 1260, 1265 (Ind. Ct. App. 2003). *Cf. Reynolds v. United States*, 549 F.3d 1108, 1114-15 (7th Cir. 2008); s*ee also Humphrey*, 148 F.3d at 728. So Paul's assertions about subsequent charging decisions, (*see* DE 51 at 9), are immaterial. *See Row v. Holt*, 864 N.E.2d 1011, 1018 (Ind. 2007).

the time it was taken." *Pearson*, 129 S. Ct. at 822 (quotation marks omitted). *See also Saucier*, 533 U.S. at 202 ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). Because qualified immunity provides "ample room for mistaken judgments," the plaintiff bears the burden of demonstrating that it should not apply. *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008) (quotation marks omitted). *See also Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008); *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). This is a "rather heavy burden." *Donovan v. City of Milwaukee*, 17 F.3d 944, 952 (7th Cir. 1994).

A plaintiff can show that a right is "clearly established" by statute or constitution in at least two ways: 1) he can point to an analogous case establishing the right to be free from the conduct at issue; or 2) he can show that the conduct was "so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Smith*, 242 F.3d at 742. In doing so, the Seventh Circuit has instructed district courts to refer to the relevant Supreme Court and Circuit case law, and, in the absence of controlling precedent, to then survey all relevant case law to determine whether there was a clear trend in the law. *Denius*, 209 F.3d at 950-51. But courts must be careful to consider the degree of generality used in describing the right. *See Brosseau v. Haugen*, 543 U.S. 194, 199-201 (2004); *Hope v. Pelzer*, 536 U.S. 730, 739-41 (2002); *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987). The greater the level of generality, the less potent *Harlow's* "objective legal reasonableness" standard becomes. *Anderson*, 483 U.S. at 639. Thus, the right must be "clearly established" in a "more particularized" sense. *Id*. at 640. *See also Brosseau*, 543 U.S. at 199; *Donovan*, 17 F.3d at 951.

11

The "contours [of the right] must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope*, 536 U.S. at 740 (quotation marks omitted). "Of course, in an obvious case, these [generalized] standards can 'clearly establish' the answer, even without a body of relevant case law." *Brosseau*, 543 U.S. at 199. But those are the "rare cases, where the constitutional violation is patently obvious," and "widespread compliance with a clearly apparent law may have prevented the issue from previously being litigated." *Denius*, 209 F.3d at 951.

So Paul does not need to find a prior case that is factually "on all fours" with this case; rather, the question is whether a reasonable officer would have known that his actions were unlawful. *See Viilo*, 547 F.3d at 710-11. *See also Hope*, 536 U.S. at 740-41 (quoting *U.S. v. Lanier*, 520 U.S. 259, 270-71 (1997)); *Green v. Butler*, 420 F.3d 689, 701 (7th Cir. 2005). "As long as officers of reasonable competence could disagree on the issue, immunity should be recognized." *Purtell*, 527 F.3d at 621 (quotation marks and brackets omitted).

Paul's qualified immunity argument is curiously confined to his arrest after he exited the car. (*See* DE 51 at 9-10.) He does not claim that the law was sufficiently clear for Moffa to know that breaking the windshield with his flashlight was a violation of Paul's rights. Nor does he point to a case that is analogous enough to allow this Court to say that Moffa was clearly on notice that breaking the Vandewalles' windshield was a violation of Paul's rights. And general statements of excessive force standards alone are not helpful and will not do here; this is simply not the case where the right is so clear that it would have been apparent to Moffa that he was violating it.

Even if Paul did argue that breaking the windshield violated a clearly established right, that argument wouldn't be a winner. Moffa was forced to make a quick decision about how to rein in a driver that was disobeying his orders. Suzette was pulling into the lane of oncoming traffic and did not bother to advise Moffa of her plan; he only knew that she wanted to disobey him. While Suzette was not exactly committing the crime of the century, Moffa nonetheless had the responsibility to enforce the traffic restrictions as well as his own authority. While one could argue that there were better ways to accomplish these things than breaking the car window, qualified immunity exists to restrain judges sitting in the peace and quiet of their chambers from second guessing the split-second decisions that officers must make. In the absence of case law establishing the right at issue here in a more particularized sense, the generalities about the use of unreasonable force will not carry the day. This is not one of those "rare cases" there the constitutional violation was "patently obvious." *See Denius*, 209 F.3d at 951.

Because generalities will not do, Paul has simply not carried his burden in pointing to analogous cases clearly establishing the right. In the end, this case is a sufficiently close call that reasonable officers in Moffa's position could believe that his actions were lawful. Qualified immunity therefore gives Moffa the benefit of the doubt.

### III. STATE LAW CLAIMS

All that's left now are Paul's state law claims, and the first thing I must do is decide whether to address them at all. As a general rule, when a district court has jurisdiction over supplemental state law claims under 28 U.S.C. § 1367 and then disposes of all of the federal claims before trial, the court should relinquish jurisdiction over the state claims rather than resolve them on the merits. *Davis v. Cook County*, 534 F.3d 650, 654 (7th Cir. 2008). The

Seventh Circuit has noted three exceptions to the general rule: (1) where the statute of limitations has run on the pendant claim, precluding filing of a state claim; (2) where substantial judicial resources have already been committed to the case and returning it to the state court will cause a substantial duplication of effort; and (3) "when it is absolutely clear how the pendant claims can be decided." *Id*. (quotation marks omitted). "The district court has broad discretion in deciding whether to retain supplemental claims." *Hansen v. Bd. of Trs. of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 608 (7th Cir. 2008).

From my review of the record in this case, I conclude that it is appropriate for me to retain jurisdiction and dispose of most (but not all) of Paul's state law claims. It is absolutely clear how the majority of Paul's state law claims must be decided. In addition, substantial judicial resources have been expended on this case, which is now through discovery. So I will narrow the scope of the claims Paul might later bring in state court in order to minimize potential duplication of effort.

The law enforcement exception of the Indiana Tort Claims Act (ITCA) immunizes Defendants against most of Paul's state tort claims. Section 34-13-3-3(8) of the Indiana Code shields a "governmental entity or an employee acting within the scope of the employee's employment" from liability for losses resulting from the "enforcement of . . . a law . . . unless the act of enforcement constitutes false arrest or false imprisonment." Ind. Code § 34-13-3-3(8). The statute is unambiguous. And based on its clear language, Paul's claims in Count IV (Intentional Infliction of Emotional Distress), Count V (Trespass Against Chattel), and Count VI (Negligence) fail with respect to all defendants as a matter of law.

But Paul's battery claim in Count III is a closer call, so I will relinquish jurisdiction over it pursuant to *Davis*. 534 F.3d at 654. About fifteen years ago, the Indiana Supreme Court held that because law enforcement officers owe a private duty to refrain from using excessive force in the course of making arrests, the law enforcement exception did not immunize officers against excessive force claims. *Kemezy v. Peters*, 622 N.E.2d 1296, 1297 (Ind. 1993). However, the Indiana Supreme Court has since disavowed the public duty versus private duty test that *Kemezy* relied on. *See Benton v. City of Oakland City*, 721 N.E.2d 224, 230-32 (Ind. 1999) (abrogating *Quakenbush v. Lackey*, 622 N.E.2d 1284, 1290 (Ind. 1993)); *King v. Ne. Sec., Inc.*, 790 N.E.2d 474, 481-83 (Ind. 2003) (observing that *Benton* implicitly rejected the public/private duty test under the ITCA's law enforcement exception). The Indiana Supreme Court has since been silent regarding whether the excessive force exception to ITCA immunity announced in *Kemezy* remains valid.

In considering questions of state law, federal courts must apply state law as declared by the state supreme court, or in the absence of a statement by that court, by its intermediate appellate courts. *Trytko v. Hubbell, Inc.*, 28 F.3d 715, 719-20 (7th Cir. 1994). Different courts have come to different conclusions on whether the ITCA provides protection for state law claims of excessive force. *Compare, e.g., Fidler v. City of Indianapolis*, 428 F. Supp. 2d 857, 867 (S.D. Ind. 2006) (holding that *Kemezy* remains good law) *and Ziemer v. Kassel*, No. 3:07-CV-153, 2008 WL 323392, at *2 (S.D. Ind. Feb. 5, 2008) (same), *with O'Bannon v. City of Anderson*, 733 N.E.2d 1 (Ind. Ct. App. 2000) (holding that *Kemezy* is no longer valid, and therefore, officers were immune under § 34-13-3-3(8) against excessive force claim). Despite this Court's previous conclusions that the ITCA protects governmental entities from excessive force claims, *see*

15

*Thomas v. City of Fort Wayne*, No. 1:06-CV-320, 2008 WL 282348, at *9-10 (N.D. Ind. Jan. 31, 2008); *Ramusack v. Swanson*, 2:04-CV-226, 2005 WL 3359114, at *12 (N.D. Ind. Dec. 9, 2005); *Fox v. Pittenger*, 1:04-CV-141, 2005 WL 1712216, at *7-8 (N.D. Ind. July 21, 2005), there simply isn't a consensus on this issue of state law. Reasonable jurists disagree. So the prudent course is to allow this claim to be hashed out in the state courts.[6]

Finally, while the ITCA does not prevent Paul's false arrest claim in Count II, that claim nevertheless fails. "Under Indiana law, false imprisonment is defined as the unlawful restraint upon one's freedom of movement or the deprivation of one's liberty without consent." *Earles*, 788 N.E.2d at 1265. *See also* Ind. Code § 35-33-1-1. False arrest requires the absence of probable cause. *Row*, 864 N.E.2d at 1016. As discussed above, Moffa had probable cause to arrest Paul for a violation of Ind. Code § 35-44-3-3(a). Because the officers had probable cause to arrest Paul, there is no genuine issue of material fact with respect to his false arrest claim; it also fails.

### III. CONCLUSION

Defendants' Motion for Summary Judgment [DE 39] is **GRANTED IN PART**. As detailed above, the Court **DISMISSES** Plaintiff's state law battery claim for lack of subject matter jurisdiction under *Davis v. Cook County*, 534 F.3d at 654. Otherwise, the Court **GRANTS** Defendants' Motion. Plaintiff's Motion for Summary Judgment [DE 50] is **DENIED**.

---

[6] The two-year statute of limitations that applies would ordinarily bar Paul from bringing this claim in state court. *See* Ind. Code § 34-11-2-4. *Cf. Johnson v. Blackwell*, 885 N.E.2d 25, 30-31 (Ind. Ct. App. 2008) (holding that the two-year statute of limitations applies to personal tort claims arising out of an arrest). But the statute of limitations would be tolled by the action in this Court. *See* Ind. Code § 34-11-8-1. *See also McGill v. Ling*, 801 N.E.2d 678, 686 (Ind. Ct. App. 2004) (citing *Torres v. Parkview Foods*, 468 N.E.2d 580, 583 (Ind. Ct. App. 1984)).

Because there are no other claims in this case, the Clerk of the Court is hereby directed to treat it as **TERMINATED**.

  **SO ORDERED**.

  ENTERED: March 10, 2009.

                s/ Philip P. Simon
                PHILIP P. SIMON, JUDGE
                UNITED STATES DISTRICT COURT